Here first for Mr. Dennis Sanchez Good morning your honor, my name is Dennis Sanchez, I represent the appellant Susan Mills. The reason why we're here today is to request that this court grant, allow this case to proceed to trial in front of a jury and to make it and to ask this court to determine what it takes to prove the actions of a university, what being terminated. In this case, the University of Texas at Brownsville decided that it was going to downsize and it was going to have a reduction in force, an RIF, pursuant to lesser classes that were going to be held. In other words, they just needed less professors. There's another way to have an RIF and that's what they call it because of financial exigency. But in this case, everybody is in agreement that the RIF was supposed to be based on academic reasons. Seems illogical, but everyone agrees to that, right? Yes, yes. And that was the testimony and that was the position taken by the university system in fact. So in order to bring about this RIF, the provost of UTB drew up a provost charge that was supposed to be in compliance with the Regents' Rule 31003. And the Regents' Rules required that certain things had to be done and incorporated into the provost charge. So the provost drew up the charge and selected a five-member departmental review committee called the DRC to evaluate and rank all of the professors within each department of the university. So in this case, there were 21 professors in the English department. The facts are pretty long and they're set out in the brief. Yes. You can continue. It would maybe help me to start, right, what is the termination decision that we're reviewing? Is it President Garcia's December letter, the July letter? Where is the termination decision that is being reviewed as to whether it's a substantial departure from professional judgment? In this case, and what we've asked this Court to do, is look at the procedures, not from a procedural due process standpoint. Well, they got a lot of procedural due process, but your position is, but then at the end it was thrown out the door. At the end, they threw it out. But if you look at the rules, it says it's just supposed to be meaningful input. So I guess one could argue, well, it was meaningful input. The President considered everything and the President made a judgment. That's the point. The President didn't consider everything. And we pointed out in our brief that there is a substantial difference between her deposition testimony and what she testified to. She testified in her deposition that she did not review any of the educational transcripts of the affected employees. She did not review the testimony given at the hearing committee. Is there anything in the record to suggest that she wasn't aware of the Chairman's double counting error? Absolutely. She was not aware of it. You claim that, and you claim it in the brief. That's certainly not what her testimony ended up being. Her testimony was, I was aware of that. That's correct, and she's incorrect. She testified in her deposition. She did not know that the hours had been miscounted by Dr. Dameron. How could she not have known that if that's what the appellate committee assessed in its recommendation, which then came to her for a final decision? Because in her letter of assuming that there was a mistake made by Dr. Dameron, I'm not making my decision on that basis. That's correct. That's what she's saying. Now, that, and she's saying therefore, Susan Mills would have been terminated anyway. If you go through and look at the rankings, there were three rankings made. The original ranking, Susan Mills was number 18 on a cutoff of 17. In the second ranking, after they leapfrogged Dr. Gallegos over everybody, Susan Mills was still number 18. But isn't the President's position consistent throughout, which is the following? Susan Mills was always a level six, and she was always last of the three at level six. Dr. Gallegos, I, the department chair told me she's special. She's a linguist. She's a workhorse. So she's just different in kind. I never compared the two. Right, except the one thing that you just said, that she was always last in line. Last of the three in level six. No, she was not. Okay. Okay. If you look at the two. Wasn't she always, she never was in the top 17. No, she was always number 18. All the way through, she was always number 18. But for the leapfrogging of Dr. Gallegos on the second round, which then converted into the final resolution, she would have been number 17. But they leapfrogged Gallegos over everybody else, and then she, you know, she wasn't number 17. The problem is that when Gallegos was leapfrogged, she... When Gallegos was leapfrogged, she took the last spot once Frazier's out. She took Mills's spot. Well, yes. But the trouble, I guess, a simplistic way of looking at it, the president says, you know what, the department chair knows exactly what that department needs. And the department chair made some mistakes. But overall, I'm looking at a linguist and someone who's not a linguist. And the department chair said, that's what they need. Is that a substantial departure from professional judgment? When you incorporate into the provost charge that that's not supposed to even be considered, yes. But does the provost charge bind the president? Why even have a provost charge? Well, I agree, it's a lot of procedure. You're going to allow the president to make up her mind and say, well, I don't like the color of his... Well, I agree. If the president said, I don't like the color, but instead the president says, I accept the department chair's recommendation, even with the mistakes in it, because those are insignificant. It's our position, your honor, that if you establish a procedure for a resolution of a project like this, you're supposed to follow that procedure. You're supposed to review the evidence. But our case law is very clear. We are not imposing a court system on these academic RIF situations. You're absolutely correct. There is some subjectivity involved in making the decision. I mean, they're personally aware of who these people are and they might prefer one over the other. And I think that is allowed. It has to be to the point that it's arbitrary and capricious. Do you think it reaches that level that the decision was arbitrary and capricious? Not just some subjective, because they can be subjective and prefer one over the other. You have to go beyond that and show why it was wrong. Your honor, in our brief, we agreed that the committee was not supposed to, is not bound to read or review every document. It's not supposed to consider all the evidence. And there's also plenty of case law that says that if a university doesn't follow its own regulations or protocol, that in and of itself, in and of itself is not detrimental either. However, you have one step after another after another, and we pointed out in our brief there were four steps. Along each way, somebody violated something either in the protocol or the provost charge, and it culminated with Susan Mills losing her job. And if you're going to be consistent, well then, fine. Now, I can imagine there being one mistake made, but there were a series of mistakes here, and it all was initiated in the Dr. Dameron letter. But did any committee ever conclude she should be level five? Well, no. She would always have been level six. Always. But the only time that she ever had a real hearing was in front of the hearing committee. And what happened at the hearing committee? They heard the testimony of the provost, Dr. Heinemann, the chair of the department, Dr. Dameron, and Susan Mills. And they reviewed every one of the transcripts. They issued a seven-page opinion. No, that's true. And guess what she won? She got a lot of process throughout. But that cuts both ways. Of course, then you can go in and parse parts of it against others, but you aren't . . . I mean, the procedural due process here was very extensive. The appellate committee made up of faculty from all across the departments. This termination was scrutinized enormously, and then the president said, I've looked at it all. But she didn't look at it all by her own testimony. By her own testimony, she didn't look at it. It would help . . . this is a difficult area of law, at least in my head. You rely on Honoré. They rely on Levitt, which is the case that says you don't have a substantive due process violation just by a rule violation. You don't even cite it, and then you don't file a reply brief. So we've had no assistance from you in regard to the decision they rely on chiefly, Levitt. Could you discuss Levitt? Well, Levitt is the one that says that a university that is . . . doesn't follow its own rules, that that in and of itself does not constitute a substantive due process violation. Right. That's a pretty weighty authority. They're saying that the president's not following the provost's charge as to levels. And what happens when you have several violations at different levels of the whole process? That's how you're distinguishing Levitt? And that's how we're distinguishing Levitt, and that's what we put in our brief, that there was a systemic failure here that compounded every step of the way. But I don't see systemic if the appellate committee got the correction. You agree with the appellate committee's recommendation? These . . . well, let me call it a systemic compounding of problems. What happened is with Dameron's letter started it off. If . . . and I agree with it. If the first evaluation had been untouched, we wouldn't be here today. We wouldn't be here today. But that first one didn't get challenged by my client because she never got an opportunity to challenge the first finding. She would have. And as she testified at both hearings, she testified I would have challenged my . . . via me and Amy Frazier, I would have challenged it. But she never got there. Instead, they initiated, they interlineated the second ruling where they leapfrogged Gallegos in front of everybody else. And now, what did she do? She challenged both of them. And she went to those hearings challenging both of those individuals. What's your best case showing that this type of decision violates substantive due process? It confounds common sense. Okay. I'm asking for your best authority case that's analogous. Honore. Honore. But Honore is also the decision that says courts give a lot of leeway. Courts give a lot of leeway. And Honore then says when there's conflicting evidence and conflicting points of view that have to go, that are determined by the credibility of the witnesses, then it has to go to a fact finder. In this case, the trial court on the motion for summary judgment believed everything that Dr. Garcia said. They just took, okay, well, she said this, so therefore, because she says it, that's the way it is. They don't look at the fact that she also gave controverting or conflicting testimony where she said at another time, well, no, I didn't review any of this stuff. So who's the best judge to judge that? In our opinion, it should be a jury. And who was the best judge to review all of this stuff? The hearing committee. And what do they do? They came to a conclusion, this was arbitrary and capricious, because they went through everything. Neither the provost nor the president at any time reviewed any of the educational transcripts of any of these affected professors. They did not review any of the testimony that was provided at the hearing committee level. They reviewed, Dr. Garcia simply reviewed the DRC-3 reports and, of course, the seven-page finding of the HC committee. And that's it. She didn't, and one thing that I find surprising is I took the deposition of the vice chancellor of the University of Texas System, Dr. Reyes, who said that if he had been provided with this question of the ability to leapfrog Gallegos from a level 7 to a level 5, that he would have reviewed every single document related to that professor. In this case, neither the provost nor the president ever did that. He never did. Go ahead. I'm sorry. Not a problem. Who's your boss? My boss? My immediate boss is Bo Echols. My ultimate boss is Mr. Paxton now. Yeah, I'm just wondering. Oh, right. Brief, brief. It's a little outdated. It's a little outdated. I apologize for not updating that for the court. May I proceed, Your Honor? Oh, yes. I'm sorry. Very well. Thank you. It would be better if we could give him back another minute, because I interrupted him unintentionally. Thank you, Your Honor. Of course. Eric Vinson from the Attorney General's Office, General Litigation Division, here representing the defendants below, the appellees before this court, Dr. Garcia, Dr. Artebis, and the University of Texas at Brownsville. Your Honor, Judge Artebis, what fundamentally is required when an entity is going to remove a constitutionally protected interest? And as Your Honor has pointed out, Ms. Mills was essentially a wash in procedural due process. It's my understanding at this stage that the procedural due process claims are no longer being pursued and that we're solely talking about substantive due process. And Your Honor is correct that we, of course, relied heavily on the Levitt case for the general proposition that mere violations of a policy do not, in and of themselves, deprive individuals of constitutional rights. We've also, of course, cited for the court a more recent Fifth Circuit case, Lewis v. UTMB, which echoes some of those concepts and basically sets out the standard, which is that an employee, a public employee, must have a property interest, which is beyond dispute in this case, and that that termination must be shown to be either arbitrary or capricious. So the standard for us to assess the validity of the summary judgment is could any reasonable juror have found that the termination was arbitrary and capricious? How would you describe the question presented? It's a little bit of a difficult question because it's typically a question of law as to whether sufficient deliberation around an issue has been provided. There can be circumstances in which material factual disputes might give rise to a requirement for a fact finder here. That is — So let's say President Garcia had said Dr. Gallegos is going to get it because she's got a Ph.D., and that was just factually wrong. That would be arbitrary and capricious? Well, I'm not — arbitrary — I mean, mistakes are actually still not sufficient. Mistakes of understanding of fact are not sufficient to show a deprivation. That's all she said. I'm going to overrule the appellate committee's recommendation. On a demonstrably false basis. Yes. I think you'd be in the territory there, Your Honor. I think you'd be talking about probably — They are contending that at least that's open in this record because — and that's why I asked opposing counsel, what is the termination decision that we're reviewing? Because when I look at the two letters, July and December, Dr. Garcia pretty much just Right? And so Mills — yeah. But if she's wrong about that — Well, as counsel just conceded, there's never been a contention that Mills was not leveled properly. The question — The question is, is Dr. Gallegos — should she have gone to five? Well, that's part of the question. The other piece of this, of course — and this has been left out of the presentation, of course — is the only reason — the person who actually up to priority five — in any event, she was ahead of Frazier and Mills — was Frazier. Frazier is the one who was bumped down into — from a position of being included for retention to a point where she would not be included in retention. But Dr. Garcia says Frazier's severance did not impact termination as compared to those in level six. That's true with respect to — that's true with respect to the other people in level six, which includes Mills. Yeah. It only affected — and then — and then and only then was — Frazier wouldn't have taken a package, wouldn't have accepted the voluntary separation package if she'd not been demoted essentially from the retention pool into the pool that's not going to be included. So that — the plaintiffs need half of the facts to be true and the other half of the facts to not be true. That is, the only reason there's even an opportunity to talk about anything is the ascension of Gallegos. But the problem for Dr. Mills is that that — that didn't leave a spot for Mills. What it actually did was bump Frazier down. Although the chronology of Frazier's severance then becomes important, and I thought from the briefs that was disputed. Well, I think it is disputed, but actually, Your Honor, if you look at the original letter from Dr. Artebis to Dr. Mills, it says that if you are ultimately chosen to be one who will not be retained, you will be offered a severance package. That is, the triggering event for the severance package is to be included in the group of people who are excluded, if that makes sense, if I said that properly. So there really isn't an issue of fact on — around that question. There is no specific timeline as to when it was that Frazier accepted the package, but the evidence shows that the packages were reserved for people who were not going to be retained for employment. Is that essential to your argument? It is not. It is absolutely not essential, actually, at the end of the day, because the only direct comparison between Frazier and Mills that is made in the actual record by the DRC was a preference for Frazier over Mills. So again, it kind of ties into the idea that Gallego's ascension certainly did not give Mills an opportunity to be retained, and the absence of Gallego's retention — excuse me — ascension would not have given Mills an opportunity. And again, in any event, the question of law that the trial court had and that this court is faced with is whether Dr. Garcia's perspective on these matters, whether we view it as the July question or the November decision, whether it was arbitrary for her to conclude, A, that Gallego's ascension itself was a reasonable step. Right? As soon as you decide that that's a reasonable proposition, there's some discretion and deliberation around that. She did testify she was unaware of the subjective factors used by the faculty chair to sort of value her more. Well, that's a little unclear, because actually, if you look at Dr. Dameron's minority report, the plaintiffs — and Ms. Mills in this case is making much of the idea that this number of hours issue is the deciding factor, that the only basis for Dr. Dameron's minority report would be these hours. It is perfectly appropriate — it would have been appropriate for Dr. Garcia to completely ignore the discussion about hours. It would have been, but her letters ended up focused on this sort of — the leveling, which then keys into the hours, the provost charge. I don't remember in the December-July letter her saying, you know, we need a linguist, and Dr. Gallego's is a linguist, the other one's not. That ends it. That's the point, that we need a linguist. That's actually the point. That's not about hours. That's about subject matter expertise, and that's the focus of Dr. Dameron's report. It is, but she doesn't then ratify that in her termination decision. Well, maybe not expressly. I mean, she's not required to recite chapter and verse in her decision. These are all of the numerous reasons why I'm making the decision I'm making. But we've come to agreement, you and I, that if the letter just said a factual inaccuracy — she's got a Ph.D. and she didn't — that would then lead to a different outcome. And I think — I'm sorry. So when you go through those letters, which articulate her decision to overturn the appellate committee, it gets close to a leveling issue. I don't see discussion of linguist or work ethic, et cetera. Maybe I'm wrong. Well, she's clearly relying on her — Faculty chair, my name. Faculty — not only the faculty chair, but also Dr. Artebis and his reliance on — I mean, she's allowed to rely on the people that report to her. She's not required, again, in gory detail, to recount all of the things upon which she relied. And, of course, I agree with Your Honor, in a very drastically different set of facts there could be an argument that it would be arbitrary. But here, the question is, was their professional judgment exercised? And the plaintiff wants to make it about whether it was exercised correctly or not, when, in fact, all that was required in front of the summary judgment was the fact that deliberation had occurred. We have the finding by the faculty hearing committee that her testimony — and they say that, quote, it was arbitrary and unreasonable. Yes. Doesn't that raise a factual issue, when you have the faculty committee saying it's arbitrary and unreasonable for it to go to trial, rather than summary judgment? Let's talk a little bit about the hearing committee's conclusions and the significance of those conclusions. A, these are not lawyers. This is not a legal standard. Arbitrary and unreasonable is, in fact, not even the legal standard. It's arbitrary or capricious. And there was no — although that term was used consistently throughout the hearing committee's decision, there were no facts that represented conduct by anyone in this or done so solely for the purpose to punish any particular individual. Remember, Gallegos has tenure as well. Initially, she's on the outside, and she's going to lose her tenure, and instead, she ends up obtaining — retaining a position, and somebody else — the plaintiff wants to believe it's Mills, but our view is it's Fraser. Either way, all these people are going to be divested of their tenure. And the question for the university that was posed to them was, which of these tenured people is going to lose their job? So with respect to the hearing committee's decision, and again, while they came to this conclusion that — and this term that they used a lot, that it was arbitrary and unreasonable, they didn't cite any actual facts that would support that conclusion. They simply — and they also seemed to operate under the assumption that because of — and they relied heavily on this point — because of Fraser's acceptance of the separation package, that that somehow basically made a space for Mills. Now, then that's, of course, why Dr. Garcia takes issue with that contention, because she understands that that didn't actually happen as a matter of law. JUSTICE KENNEDY How does this case differ or can it be distinguished from the Honoré case, where you had the faculty recommending one thing and the President overruling it, and this Court said it goes to trial? MR. CHAUNCEY I'm going to refer to that case as Douglas, because I'm not good with the pronunciation of that Honoré issue, but we're talking about the same case, of course. The key distinguishing feature that I see in Honoré versus this case and all the other cases, whether it's Loudermill, whether it's — excuse me — whether it's Levitt, whether it's the more recent case of Lewis or even Ewing, is that I think the thing that troubled the Court, the Douglas Court, was the fact that the plaintiff — there were really two components. Number one, the plaintiff began his — I want to — his employment, essentially, with the university under an understanding that if he simply worked there for seven years of credit, he would automatically, without discretion, be entitled to tenure. There was — unlike a more traditional tenure review, where there are objective and subjective criteria that are included in the decision, at the time, at this institution, it was automatic. In addition to that, there was also this aspect of First Amendment protected conduct that he had engaged in, which was somewhere in the mix of the reason — the only reasonable basis that anyone could find for anyone in the President's position to reject the decision of the faculty and whatnot. Here we have a much, much different situation. There is no automatic right to permanent employment as a tenured professor without regard to financial exigency or circumstance. And I'll point out on this same point here, and it ties somewhat into Douglas, and although the decision is not unfettered, that the rule that we're citing here, Rule 31003 on Record 151, says expressly that the President has the final decision to either accept or reject the recommendation of the hearing committee. I thought that was for financial interest reductions, and everyone's, for some reason, agreeing this was an academic interest. Well, that's certainly the stated basis of the — In other words, the language you just quoted — Yes. — is that triggered by what all agree was the basis for this riff? As I have understood this case, 31003 was the ultimate governing provision under which — and this is abandonment of academic programs, and that's what — And it divides those into two. Yes. Academic, financial, and the language you just quoted, I think, is financial. It's a small point. You could be correct. There is some, you know, again — How many — in the time period here, how many different tenured faculty members across all departments? Does the record reflect, did Dr. Garcia have to make decisions about? Are we solely talking about the English department here? No. I'm — Oh, campus-wide? Was she reviewing a great, great many of these packages? You know, Your Honor — The record doesn't — — background on this, because there are actually some other cases that flow from the — It's not in this record, of course. Oh, it's not in the record, then. That's fine. But, I mean, there were other departments, and just for perspective, you know, the estimation was that a campus, when the two entities were together, there were 15,000 students, and that the estimation was that only 7,000 of those would be retained by University of Texas at Brownsville, meaning a greater than 50 percent reduction, which really — And the president makes the determination as to each one, in the end. Ultimately, that's correct. And the rules seem to say everything below the president is meaningful input. Is that correct? Is that the phrase? Well, that's the — that's certainly the — I don't know if they use those terms, but that's certainly intended, but, you know — I'll come back to the question I asked beginning. It would be very helpful to me. What is the limiting principle? In other words, what would — would courts not be able to reassess if the president said, I've read everything, and I just disagree with everything that was done below, but I've read it all, and I've thought a lot about it? Is that invulnerable? It is not invulnerable if the plaintiff can show that there is some reasonable dispute as to whether that, in fact, happened. Here, we have the benefit of a letter, which we can just take the letter on its face. The letter — both letters. Well, the initial letter is basically a termination letter. There's not a lot of discretion around that. That logic would collapse substantive due process into procedural due process. I understand the pitfall there, Your Honor. And yet, at the same time, the question for the Court and for this Court is whether there is a fact issue as to whether discretion was exercised or not, whether deliberation was involved, against a background of deference that the courts are required to provide academic institutions when they have to make these types of choices. And here, respectfully, although there are peripheral challenges around some of the smaller facts, there really isn't a genuine issue of material fact relating to whether or not Dr. Garcia exercised discretion at the end of the day, whether she exercised deliberation. And there's certainly no allegation that I've seen anywhere that it was done with an intent to deprive Ms. Mills specifically. So we're not really talking about capricious. We're talking about arbitrary. And there was nothing arbitrary about the way that Dr. Garcia exercised her discretion. It wasn't about the color of people's hairs or the type of shoes they wore. It was relying on a belief that was expressed clearly by Dr. Dameron that the value — assuming that Gallego's ascension had some effect on Mills for the sake of argument, that it was not about hours. There was a reference to hours, and at the very end there was a very short reference to she's valuable. The bulk — and I would encourage the Court to go back and look at Dameron's minority report. The bulk of his minority report expresses the view that Dr. Gallego's was valuable in the sense that her evaluation didn't properly capture her academic grounding. And his own testimony — again, he's not a lawyer — is problematic in that he uses words like that. Oh, well, strictly speaking, I made a mistake and — Well, he's talking about the hours. He did — he's conceding that he made a mistake on the hours. He's allowed to make a mistake on the hours. I thought he also said, well, my other impressions that I recorded as to her were as to her, but I didn't do that for the other people, and so those subjective factors maybe weren't — no? Well, it is true that he only wrote one minority recommendation, and it was only for Dr. Gallego's. And again, assuming that it has an effect on Ms. Mills, the only attack factually that there has been on — that I'm aware of — of Dameron's view is that he got the hours wrong. And by the way, we're talking about 9 versus 18. We're not talking about 50 versus 100. Did she even qualify to teach English, given that she had such a limited amount of postgraduate English courses under the Southern College protocol? Are we talking about Gallego's or Mills? Gallego's. Yes. If you were not qualified to teach, that was an express basis to exclude somebody from inclusion in participation if you didn't meet minimum requirements. And under Southern College protocol, she qualified even though she only had 9 hours of postgraduate English courses? That's my understanding, yes. I'm not sure quite how that sorts out either way. Is there illuminating case law from other circuits in the context of RIF and tenure? I mean, there are certainly cases that talk about — this particular factual scenario is really not one that's directly analogous in terms of the facts. That is, some separation of an entity requires it to be cut more — you know, essentially in half. There was some dispute. Was it Lewis that says the standard has to be it shocks — Shocks the conscience. But you're not embracing that because that's sort of a stray remark? Or have other courts embraced that as — Well, this court used that language. And in fact, I think that maybe originally came from a Walker versus — Texas versus Walker that has to shock the conscience. Do you know of any other circuit that's embraced that? I'm not aware of any, but this circuit certainly has embraced that concept. And as of yet, the plaintiffs have not provided any evidence that would suggest that this decision shocks the conscience sufficient to deprive Ms. Mills of a substantive due process right. If there are no other questions, I'll yield the balance of my time to the panel and thank them for their time. Thank you, sir. I'll try to be brief. To answer a question that you raised, Your Honor, when the issue of the letter from Dr. Dameron to — was presented to — a minority report was presented to Mr. — Provost Artebiste, Provost Artebiste testified at the trial that he had received approval from the vice chancellor's office to make that leapfrog designation. However, when I took the deposition of the vice chancellor, he said that never happened. That is a contradiction of what Dr. Artebiste — because, see, the provost's charge was 003, and especially — and it was underscored that SACS was supposed to be followed. The criteria established by SACS, Southern Association of Colleges and Schools, was supposed to be followed precisely. And he said, that's how we did it. I got permission from the vice chancellor to do this. So what was the requirement? Teach English. She didn't qualify. She had an education degree, not an English degree. She should have been in the education department, not the English department. But he wanted her to be in the English department. That's why he was making these suggestions. Also, the provost's charge precluded any subjective or, hey, I used to work with this person, and they've got a good work ethic and things like that.  But he admitted, Dr. Dameron, on testimony, that, yes, he did stray outside the mandates and the parameters of the provost's charge. The severance package had to be taken by the professors before the July 30th letter of termination. So Dr. — excuse me, Amy Fraser elected to take severance well before the July 30th letter of termination of Susan Mills. So what's the record set for when Amy chose to take severance? She chose it about two weeks before the — There's a record set in your brief on that one. It's in the record, Your Honor. What's your limiting principle? In other words, president's termination is arbitrary and capricious when — When is she — I mean — At what point does it become arbitrary? Well, the university president's, in a RIF context, is assessing — has got to make really tough choices. And I think the record doesn't reflect she had any animus towards this lady. So people had to be cut. We have 16 people with PhDs. No one's disputing that. So there's one spot left, and there are a bunch of people qualified. The president can't be expected to stop and read every single candidate's all-educational transcripts. Short of that, it's arbitrary and capricious. So what's the best elucidation of when it becomes shocking or arbitrary for the president to say, I've read it all, and these are different people, and I'm making the decision that apple instead of orange? I think the elucidation was the light turned on when Dr. Reyes, the vice chancellor of the UT system, said, if this came to my desk, I would have read everything on this. Because it was an isolated situation. It's not like this happened every day. We're the only people out of this whole RAF. We're the only people in front of the court. And when she received the report from the HC, and she had a different opinion, it was her obligation at that point in time to sit down and go through the file, read the transcripts, figure out what really happened. Call the people and say, why did you guys rule this way? What happened? Get to the bottom of it. She didn't do that. In her deposition testimony, she testified very clearly what she reviewed and what she didn't review. And she didn't review any of the educational transcripts. Didn't review the testimony at the HC hearing. Why? So yes, that's shocking to me. But on the other hand, the president relies on faculty chairs' recommendation. That's rational. That's rational just at that level. She selected the HC review board. Right. And they were trained. And so amazing amount of process given. But president ultimately defers to chairman of department. And Dr. Heinemann in his HC testimony said that he, when they got the instruction back from Dr. Artebis to leapfrog Gallegos, they didn't bother to verify the validity or veracity of that finding. Mr. The fact. No, I'm sorry. You have one short statement. I'll let you do it. No, that's fine. Thank you. Thank you for your time. Thank you very much. All the cases.